This morning is 2011-1008, Qatar International Trading versus the Air Force. Mr. Kohler, you're reserved five minutes for rebuttal. You can move your honor. May it please the court. The board's decision on appeal here is fairly flawed for two fundamental reasons. It should be reversed with a finding on the merits for QIT. First is our position that the board committed reversible error when it ignored four critical clauses of the contract in reaching this decision. And then second, having ignored these clauses, as well as the implied duty of good faith and fair dealing, the board crafted an entirely new legal principle without legal precedent or justification. Just to be clear, as I understand it, there are two somewhat separate arguments here. One of them is that there was unauthorized use of the actual phone by a government employee during the period before it was cloned, and that the amount of dispute there is just a few hundred dollars, correct? That's correct, your honor. And the other argument is that the use of the number and identification card by the cloned phone results in liability, and that's where most of the money is, right? That's correct, your honor. So what is it that imposes liability on the government for the cloned use? Well, I think that there are, very specifically, two clauses. The changes clause of the contract, we believe that as a result of the government's action, a constructive change occurred. And then secondly, under the payments clause, the payments clause specifically states that the government shall pay for all charges arising under the use of these phones. What was the change? I mean, the government wasn't directing the service be provided to the fraudster, right? No, it wasn't, your honor. We believe the constructive change arises because this is a unique service contract in the sense that, quite frankly, you won't find another case as comparable to this one because it is a situation where the company is a service provider, it's a passive service provider. It has no affirmative actions to take. The government is the holder of the telephone, and the contract is awarded based upon three things. One, the term of the contract, which is eight months, two, which is fixed, two, the fixed fee of the agent's fee, which is also fixed, and then the government estimates what the usage is going to be for a period of that eight-month period. It's an estimate on their part. They have to, in that setting, they have to- You're using the changes clause to get around the $25,000 limit, is that what you're using it for? Yes, your honor. But there's the more fundamental question as to whether the government is liable at all for service that it didn't receive that was provided to the fraudster. Why is it that the government has to pay for that under the contract? Well, I guess the flip side of that question, your honor, is why is the government not liable? In other words, the phone is in their possession. It's under their utilization. The contract provides, the payment clause provides that they are to pay for all service charges. It doesn't say that they're not going, it does not absolve them from a charge of only those calls to specific people or authorized people, and it does not say that the government's not going to be liable for theft or loss or cloned phones. It's just a blanket payment provision. Well, the risk of loss provision deals just with the physical phones, not with any services provided. That's correct. Is that right? And I think that the risk of loss provision, quite frankly, has no place in this contract. Neither party argued risk of loss because it's obvious when you look at the clause, and obviously even the UCC, that only applies to goods or services that are being delivered or is our position that the board, ignoring the changes clause, which would be, we see a constructive change in the payment provision, crafted this principle that liability was going to be because the services were stolen, if determined, from QIT. But the board doesn't tell us how it made that decision. Why is it that it was stolen by QIT, and why not stolen from the government? Why shouldn't we look at this contract in the light of general background principles of U.S. law? I mean, the contract specifically says it's governed by U.S. law, right? That's correct. So as I understand it, the general rule in the United States is that where you have something like this, that the service provider is responsible for the unauthorized calls in a cloning situation. Isn't that generally true? It is generally custom that a U.S. service provider does not cause the payment when service charges have been cloned. Now, what's interesting is when you look at all the discussion about, as far as what happens in the United States, to me it's clear that the agreement between a service provider and you or me, it doesn't say, the contract doesn't say you're not going to be responsible for cloning. That's exactly the point. That these contracts don't have a provision about that. That's correct. Just as the contract we're dealing with here doesn't have a provision about that, and that the background principle that's evolved is that the provider is responsible and not the customer. Your Honor, I would think just the opposite. I would say that because in our case the contract says you shall pay services, in a commercial contract it says you shall pay, and then it's up to the telephone company if it's going to forgive those charges. In this situation, QIT as a third-party provider was required, and it was mandated by QTEL to pay those charges. Who has the opportunity to provide for those particular services? Who has the first opportunity to know that the phone has been cloned? That would be Saria, would be the satellite service provider. They would have the first notice. And to whom do they send that notice? Saria would send that notice to QTEL, and QTEL then in turn sent that notice to QIT. QIT. Who then in turn notified the government. So at that point in time, if QIT already knew of the cloning, wouldn't that be their responsibility to pick up the phone and say, well, we need to change the chip on that phone because it's been cloned? We have no authority. In other words, under the contract, QIT has no contractual authority to terminate that service. And to me, as the government notes, this was in a combat situation. And now we're looking back at facts. At the time, QIT has no knowledge of how these phones are being utilized. It doesn't know if they're being used in a combat situation. It doesn't realize what might happen if it suddenly pulls the plug. On these phones. So that from the contract standpoint, only the government can terminate a contract. I mean, it would be a catastrophic implication for QIT to independently determine that I'm going to pull these phones not knowing what all the facts and circumstances are. Are we assuming that you don't need a physical SIM card in order to be able to clone it? That you do it through the wire? It can be done? It can be done electronically. It can be done electronically. But there's no contention that the cloning occurred here as a result of the government's failure to take care of the physical phone, right? It's not the care of the physical phone in the sense that it was lost or stolen. It is in the sense that the utilization of the phone, there's indication that the utilization of the phone allowed that satellite phone to be cloned. And that the government... But didn't the board resist making any findings? I'm sorry, Your Honor? Didn't the board resist drawing any conclusions and making any findings about that? It surely did. Which is somewhat surprising in the sense that there are the parties into stipulations of fact that I think would substantiate the fact that as a result of the use of the phone by at least one and possibly two of the interpreters that were making calls to Syria and other places right before the cloning began, that one could make the assumption that as a result of those calls that that phone was cloned. The other aspect of this is once QIT notifies them on the 18th of July, and excuse me, on the 20th of July, exactly what the phone is, you know, the government took no action. The government could very easily have said, because again, we don't know, the government, QIT does not know what actions is the Air Force is using these phones in. Well, that's not exactly right. They didn't take, they asked for the itemized bill at that time. In other words, they took that action and that action was one step towards determining whether or not they ought to, what they ought to do with the phones, right? And they asked for an itemized bill so they would know how to proceed and it wasn't, there's some delay on your end in terms of providing that itemized bill. But there was a delay. But again, Your Honor, there were five phones. Only one phone that was identified on July 20th was identified as being the phone that was getting the excess charges. It is our position that the government could very have easily told us to partially terminate that service. They had four other phones. As a matter of fact. But that doesn't resolve the, that doesn't resolve the question here, because there were substantial charges incurred before anybody had any notice of the cloning. That's correct. So that might have some bearing on the quantity of damages, but we still have to decide who's responsible before either party had any notice of the cloning, right? That's correct, Your Honor. It is our position that because this, because it is a unique service contract, in other words, we were not performing any particular service, an affirmative service. It's being, it's a, the government has the control of the phone. It's the one that establishes the estimate for the monthly service charges. And it's our contention that they have the responsibility since they, it is their estimate, that they have the responsibility to ensure that those phones are used in a manner that will not exceed the value of the contract. But in the absence of the bill, they wouldn't have known about that. I mean, you were the one, you knew before they did what was going on, right? That's correct. Okay. Your Honor, the military's had these phones. This isn't the first time that they had these particular phones. But is it unreasonable for the Air Force to ask for a minimized bill at that point so that they could figure out exactly where the calls were being made to and why they were being made? That was not, no, Your Honor, that was very reasonable, that they want to make a determination of how the charges were being incurred. But what does that have to do with the, that's the investigation side of it. They could, at that point, have said, if these charges are being incurred, we want that phone terminated. There were four other phones, and they had said, even on that very day, that they didn't even realize those phones were being used. So it seems to me that QIT did everything that it possibly could to alert the government in a timely manner about these charges, that the government, it is their estimate, they're the ones that they have to monitor this. Your Honor, to your point, if the government wanted QIT to monitor those calls on a, on a real-time basis, it could have imposed that obligation in the contract. There is no such obligation. Well, wouldn't the government? I don't think the government's contending that there was an obligation to monitor the calls on a real-time basis. What the government is saying is, we're not liable for cloned usage, regardless of who got notice and when. I agree. And the problem is that, you know, the contract seems to provide that service will be given to these particular phones, and it doesn't contemplate any payment for cloning, right? It doesn't, nor does the payment clause say that the government's not going to be liable for service charges if the phone is lost, stolen, or cloned. Mr. Kohler, you're well in the rebuttal time. We'll restore two minutes of your rebuttal time. Thank you. Mr. Bennett? May it please the Court. My name is Hunter Bennett, and I represent the respondent, Epley, in this matter. At the outset— So why isn't the government liable for the few hundred dollars of unauthorized calls made by its own employees? Well, as Your Honor no doubt recognizes, the government did concede that its employees made at least a handful of these calls for which service was denied. It's difficult to say. The Armed Services Board of Contract Appeals, as QIT points out, did not address these calls, so it's difficult to say whether— well, in fact, it appears they did not make a determination as to whether the government made all of these calls. With respect to those calls, it may be that the wisest course of action would be to remand on that very specific issue to the Armed Services Board of Contract Appeals and ask the Court to make a finding. With respect to— Because you agree that to the extent that the phone's unauthorized usage was made of the physical phones by government employees, that the government's liable for that, right? To the extent the government employees made those phone calls, then the Air Force is, in fact, liable. But the bulk of these calls, of course, more than $300,000 worth, there's no dispute that those calls weren't made by the Air Force. Those calls were made by fraudsters using a cloned cellular phone or phones. It's also not in dispute at this point that it's impossible to tell how that cloning took place. Now, it could be that the fraudsters managed to capture the electronic transmission of an official Air Force business call, or it could be that the problem occurred even further up the chain. Perhaps a rogue employee of QIT or its supplier, QTEL, or even Thuraya could have provided the information necessary to clone the phones to the fraudsters. We just don't know, and that's what underlies the Armed Services Board of Contract Appeals' conclusion that the Air Force has no obligation to pay for the more than $300,000 worth of phone calls. But why does the Air Force need to wait until they get an itemized bill to figure out which phone has been cloned? They were told, they identified which phone was already cloned. What these phones were used for was to communicate with confidential sources of intelligence information in Iraq. By terminating service to these phones, they were cutting off not only communication with these sources, but also access to intelligence information, potentially. So on July 20th, what the Air Force was told was, your usage charges for the month of July exceed $100,000. Those usage charges are being attributed to phone 4735. QIT concedes, however, that based upon the scan information that are provided on the 20th, it was impossible for the Air Force to discern the exact nature of these calls. However, QIT did say on that day that it was going to provide an itemized invoice any day now. The thing that seems to make no sense to me in this case is you say the phones, the whole basis for the phones and the service is in connection with intelligence and confidential sources. It's just a little odd to me that firstly, you have the government letting anybody use, or not anybody, but unidentified people use the phones. And then they find out there's something weird going on. Wouldn't common sense dictate that they would have said, well, geez, we better stop using these for confidential sources, whatever, until we figure out what the heck's going on? Well, with respect to the phones, although they were available for use by anybody in the unit, they weren't available to just the general public. They were maintained on an Air Force base that only Air Force employees and contractors who had received permission had access to. So there was a limited universe of people who could use the phones. And again, by terminating service, you're eliminating not only the possibility that Air Force employees could call out using these phones, but also that intelligence sources that were out there, they could well have had the numbers into these phones. Yeah, but you know that the intelligence has been compromised. Something with respect to use of these phones have been compromised. Wouldn't that suggest that the government would say, end of story, we've got to figure out what's going on before we use them when we want? Well, on the 20th, what they did know, Your Honor, was that based on QIT's representation, there were excessive charges. Again, it was impossible for them to tell on the 20th the exact nature of these calls. All they had was an oral representation from Mr. Brown. It may have turned out that Mr. Brown was mistaken. There was no documentary evidence showing what... So you agree with QIT that QIT didn't have the authority to terminate the phone service once it saw the high level of charges? No, we don't, Your Honor. As Your Honor pointed out... Did they have authority to terminate? We believe they did. As Your Honor pointed out, there's a not to exceed cap in this contract, that the contract is not to exceed $25,000. Now, QIT could have taken the position based upon this once it learned of the excessive charges that it had fully performed under the contract. Was that the only basis for terminating? Which that suggests that maybe you're liable up to $25,000, doesn't it? We don't believe it does, Your Honor, because in this case, first of all, by the time we were even notified of these excessive charges, the charges were already over $100,000. Could they have terminated, forget about the $25,000 cap, could they have terminated and said, what looks to us is that the phone's been clumped. We're going to terminate service on this and we're going to tell the government about that. Did they have the authority, QIT, have the authority to do that under the contract? We believe they did, but we believe that it's the $25,000 cap that gave them that authority. But then they'd have to wait to get to the $25,000 cap before terminating, right? Although, as you can see, that's correct, Your Honor, but they can see that by the time they were even alerted to this problem, the charges were already over $100,000. Based upon the NT provision of the contract, what QIT should have done in order to protect itself was have the ability to monitor these charges in such a way that they at least would have learned of the problem long before the $25,000 cap was blown. That's not the case in this particular case. And if I could address briefly the question that Your Honor raised. I find it very troublesome that you're saying that they couldn't terminate the service because domestically when you have a clone phone, as I understand it, that people would accept the fact that the service provider seeing that the thing was being misused wouldn't have to call the customer and get the customer's position to terminate the service. They could just terminate the service outright, no? Well, it's difficult for me to speak about the way in which things happen in the United States. Typically, when I've had problems, for instance, with a credit card, you get a call from the provider and they say there's suspicious charges and you say, well, what are the nature of these charges? And they say, were you at J.Crew and did you charge $4,000 worth of credits? Well, and they stopped the charging on the card without talking to the customer. We've all had the experience of cards being rejected because they're being misused. They don't get your permission to do it before they stop it, right? Well, with that in mind, I mean, here- Well, I thought your answer was they could have unilaterally terminated. They could have based on the not to exceed provision in the contract. At what point? When it went over $25,000? They certainly could have by the time it went over $25,000. But not before? Not based upon the not to exceed provision, Your Honor. But the reason that the United States wouldn't be liable for those calls up to $25,000 is in this particular case. Again, there's no dispute that the Air Force did not make these calls. QIT's argument that there's nothing in the contract that limits the Air Force's liability with respect to these calls misses the mark. What if when they called you to tell you about this potential problem and you asked for the itemized list, they had said, we are telling you, we need to shut this off now. We want your permission. But we need to shut this down now, or somebody is going to continue to incur liability. Would the situation be any different? Well, again, that's not the situation here. But if they were able to provide some sort of explanation as to what exactly these charges were, and some sort of, the Air Force just simply didn't have enough information in this case. Well, they had enough to know that the amount wasn't coming from the Air Force, right? Or if it was, then it would have been a problem on the Air Force's side, right? That's correct, Your Honor. But again, there, of course, is always the question as to the fundamental reliability of the information that QIT is providing. And since they couldn't give an itemized bill or even explain the nature of these calls, at that point, given the importance for which these phones were being used, which is to communicate with confidential sources of intelligence information, the reasonable thing for the Air Force to do at that point, based upon QIT's representations that an itemized invoice was coming any day now, was to wait. By August 1st, however, when that promised invoice still had not appeared and QIT was representing that there were an additional $80,000 worth of charges that had been incurred, at that point, it was clear that QIT was only making empty promises and the reasonable thing to do was terminate on that date. Now, QIT's argued that they could have terminated service to just this one phone. But again, by terminating service to any phone, you're eliminating not only the possibility that Air Force employees can call out on that phone, but that sources can call in on that phone. Well, that seems to cut against you. That doesn't work for you, does it? Well, we believe it does because we believe it explains why the Air Force did not terminate service on July 20th, but elected to wait until August 1st and why that was reasonable. Again, I'm missing the security aspect of this because in the interim, I mean, your argument is security. We had to keep these phones going because we might get confidential input. Once you know there's something screwy going on with these SIM cards in this phone, it seems to me that the reliability of whatever was coming in would be compromised. But based upon what they knew on July 20th, they didn't even know that that was the case, Your Honor. Well, put it more pointedly. When the thing's been cloned, if a confidential informant calls in on the phone, can the person who cloned the phone receive that call? That I don't know, Your Honor. And that's information that can't be discerned from the record. But can QIT have a list, an itemized list of the incoming calls also? I believe it could. I believe that, and again, it's difficult to say based upon the information on the record, but when you look at those phone bills, there is a list of phone activity that's taking place with respect to that phone. It would seem to be very easy to track down confidential sources at that point, don't you think? This confidentiality aspect of it, I'm perplexed as Judge Crost is. It doesn't make much sense. Every single time you come up with a bill, the government sees the hide behind the top secret stamp and says, no, we can't do it because it's confidential. But at the same time, you knew what was going on. You knew that the charges had been exceeded. You were told that on July 18th or 20th, and all of a sudden you continue the aspect of give us an itemized bill so we can figure it out. But you were told specifically which phone it was that was causing the problem. We were told again that there was a problem, that the usage was excessive. It wasn't until we received an itemized bill that it became clear that the problem was indeed that this phone had been cloned. Again, we had scanned information as to what was going on on July 20th. What we knew was that there were excessive charges that were being attributed to phone 4735. But the excessive charges were due to outgoing calls, not the incoming calls. It appears that that's correct now in hindsight. But again, it's not clear that that information was conveyed to the Air Force on the 20th. Again, what they were told was that they had excessive usage charges as of July 20th, 2005. It could be that Mr. Brown told them that these are all outgoing calls. I'm not sure about that. What we do know is he told them that there was excessive usage. And again, taking a look at the contract and specifically the contract's payment provision, what it says is payments shall be made for items accepted by the government that have been delivered to the delivery destination set forth in this contract. Now, QIT concedes that items include services. And this is a contract for satellite cellular phone service. This service was never delivered. The service that resulted in the fraudulent charges was never delivered to the Air Force. It was delivered to the fraudsters. And pursuant to this contract, the Air Force is obligated to pay for its usage of these satellite services. Again, this is why the Air Force wouldn't be liable. Maybe there are several different issues in the case. One is the liability for the calls that were made before anybody knew about the cloning. The second would be the period after QIT knew of the cloning, but before the government did. And the third one would be after the government knew about the cloning and didn't do anything about it. I mean, there could be different rules here  In theory, there could be, Your Honor. Again, I'm hesitant to say when QIT alerted the government to the cloning, because again, the government wasn't alerted to this cloning problem until August 21st. On July 20th, the government was alerted that there was a problem. But even if you were to accept that the government was liable for the calls as of July 20th, well, that liability certainly cut off by August 1st, 2005, which is when the contract was terminated for the government's convenience. And at that point, QIT waited an additional three days or possibly four actually till August 4th, 2005, even to attempt to notify QTEL, its supplier of the need to terminate service. And they chose a method of notification that QTEL didn't receive until August 7th. Now tellingly, once QTEL received that notification, it contacted Thuraya and the service was cut off that day. So under the termination for convenience clause of the contract, which provides that a contractor cannot recover expenses that could reasonably have been avoided, it's not entitled to any charges that continue to accrue after the termination for convenience on August 1st. And again, QIT has never offered any explanation for why it waited from August 1st until August 4th to notify, even attempt to notify Thuraya or QTEL. What provisions does the government include in domestic contracts for phone service to deal with phoning? That I can't answer, Your Honor. I think the problem with this contract obviously is that it just, it wasn't drafted in order or with a specific provision that addressed the cloning problem. But again, the fundamental nature of the contract and its provision that the Air Force is liable to pay for services which it received. There's no FAR provision or standard clause that deals with cloning and telephone service. Not that I'm aware of, Your Honor. And I would point out only, as Your Honor pointed out, the custom in this country is that the provider absorbs the loss from cloning. And we have QIT's representation that it doesn't work that way in Qatar. But again, the only thing that QIT offers in support, they don't cite a statute or a case or anything. All they cite is a demand letter from their provider, QTEL, which of course also doesn't cite a statute or any case law to support its argument that it's the customer who absorbs the loss rather than the provider. Which wouldn't matter, in your view, because U.S. law governs. That's correct, Your Honor. Thank you, Mr. Allen. Thank you, Your Honor. Just very brief comments. On the last point, we agree that U.S. law applies. I'm not aware of any statute that a service provider cannot charge the user of a telephone for cloned services. There is no statute. I think what there is a custom that's represented in some of the attachments in the record. But it's a custom. It's not U.S. law. And the custom in Qatar, and as evidenced by the agreement that corresponds between QTEL and QIT, it is clear that they have a contractual requirement to pay it, and they did pay it. With regard to the not to exceed as being the basis upon which we could terminate that contract, it's interesting that this contract has three elements to it. Two are fixed, as far as a contract. It's for eight months. And the agent's fee of $300 is for each month. Those are fixed. The only variable, the only estimate, is in the service charges. So that let's assume that all these charges happened during the first month. There was no basis upon which QTEL, excuse me, QIT could terminate that contract. It was an eight-month contract. It simply stated there was no contractual basis or justification for QIT to terminate that contract once it saw these excessive charges. Thank you, Mr. Scully. Case is submitted.